IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF NEW MEXICO

CLIFTON SKIDGEL,

    Plaintiff,

v.            No. CIV 12-7 JP/LFG

MICHAEL MARTIN, SHERRY PHILLIPS,
and CORRECTIONS MEDICAL SERVICES,

    Defendants.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

  This is a *pro se, in forma pauperis* civil rights action brought under 42 U.S.C. § 1983.

Plaintiff Clifton Skidgel ("Skidgel") is incarcerated at the Northeast New Mexico Detention Facility

("NENMDF") in Clayton, New Mexico.

  On November 21, 2011, Skidgel filed a civil rights complaint against Defendants Michael

Martin ("Martin"), Sherry Phillips ("Phillips") and Corrections Medical Services ("CMS" or

"Defendants") in the Eighth Judicial District Court (Union County) in the State of New Mexico.

[Doc. 9.] On January 3, 2012, Defendants removed the civil rights lawsuit to federal court. [Doc.

1.] On January 19, 2012, Skidgel filed a brief in support of his "tort complaint." [Doc. 9-3.]

---

[1]Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed. *See, e.g.*, Wirsching v. Colorado, 360 F.3d 1191, 1197 (10th Cir. 2004) ("firm waiver" rule followed in Tenth Circuit holds that a party who fails to object to magistrate judge's findings and recommendations in timely manner waives appellate review of both factual and legal questions).

Skidgel's complaint alleges that Defendants violated his civil rights, including his Eighth Amendment right to be free from cruel and unusual judgment.  He also contends that he was improperly denied medical treatment, unduly harassed for bringing litigation, and that prison policies, standards and procedures were violated. [Doc. 9-1, 9-3, attached state court pleadings.] Skidgel seeks an award of "$100.00 a day for illegal segregation (7 days); $1000.00 per each constitutional violation; $100,000.00 from Defendant CMS for pain and suffering unnecessarily, or a jury trial on all counts." [Doc. 9-1, at 10.]

## Procedural Background

On December 28, 2011 (while the case was still in state court), Defendants Phillips and CMS, filed an answer. [Doc. 9-1.]  On January 3, 2012, Martin filed an answer to Skidgel's complaint. [Doc. 3.] On January 19, 2012, Skidgel filed responses to both answers. [Doc. Nos. 8, 8-3.]

On February 21, 2012, the Court directed Defendants to provide Martinez reports that addressed Skidgel's allegations.  The Court informed Skidgel that he could file responses to the reports. [Doc. 17.] On March 7, 2012, before the Martinez reports were due, Skidgel filed an unauthorized pleading and attached a number of documents, some of which he described as being responsive to the Court's Order directing Defendants to produce Martinez reports. [Doc. 20.] On March 8, 2012, Skidgel filed another unauthorized pleading with 135 pages of exhibits, many of which are duplicates of medical records provided by Defendants with their Martinez reports. [Doc. 21.]

On April 23, 2012, Martin filed his Martinez report with attachments. [Doc. 23.] Also, on April 23, 2012, Defendants Phillips and CMS filed their Martinez report with attachments. [Doc. Nos. 23-34.] On May 7, 2012, Skidgel filed a response to Martin's Martinez report, and on May 11,

2012, he filed a response to the other Defendants' <u>Martinez</u> report. [Doc. Nos. 39, 41.] On May 16, 2012, Martin filed a reply in support of his <u>Martinez</u> report. [Doc. 42.]  On May 23, 2012, Skidgel filed a "supplemental response" to Defendants Phillips and CMS's <u>Martinez</u> report exhibits. [Doc. 44.]  Also, on May 23, 2012, Skidgel filed an "answer" to Defendant Martin's reply. [Doc. 45.]  On May 25, 2012, Defendants Phillips and CMS filed a reply in support of their <u>Martinez</u> report. [Doc. 46.] On June 4, 2012, Skidgel filed a "response" and a "reply" to Phillips' and CMS's reply. [Doc. 49.] Although many of Skidgel's pleadings were not authorized, the Court reviewed all pertinent pleadings and attachments.[2]

## **Factual Background**

The Court briefly summarizes Skidgel's many allegations.  First, Skidgel claims that Martin ordered him and four other inmates to be placed in segregation on June 30, 2011 until July 6, 2011, "without any means to challenge the lockdown or the sanctions imposed." [Doc. 9-1, Complaint, at 2.] He states that he "landed in lockdown" without a misconduct report or hearing, instead of being placed in the prison's general population.  Skidgel further contends that Martin subjected him to arbitrary punishment and disciplinary sanctions in violation of his Fifth and Fourteenth Amendment rights and that Martin violated his equal protection rights and liberty interests.  Skidgel asserts that Martin did not comply with specific American Correctional American standards, along with pertinent corrections' policies or procedures.

---

[2]Fed.R.Civ.P. 7(a) authorizes the filing of a complaint; an answer to the complaint; a third party complaint; and answers to counterclaims, crossclaims or third party complaints.  No reply to an answer is permitted unless one is ordered by the court.  Skidgel's responses and replies to Defendants' replies were improper and not authorized by Rule 7 or the Court.  So, too, Skidgel's replies to Defendants' answers were improper and unauthorized, as were his various supplemental pleadings.  In future litigation, Skidgel is admonished to comply with the rules of practice and procedure.

Skidgel's other claims concern medical appointments and medical care, and are directed mostly at Defendants Phillips and CMS.  For example, he alleges that a long-awaited medical appointment, scheduled for July 28, 2011, was canceled when the corrections facility was placed on restricted movement status to allow for a religious presentation by a celebrity.[3]  Skidgel contends he had waited for this medical appointment since June 9, 2011, well over a month, and suffered pain during that time and for the next 4-6 weeks, while he awaited the next scheduled doctor's appointment.

Skidgel also alleges that CMS refused to provide adequate and proper medical diagnoses and treatment for his many medical conditions, including "adrenal adenomas,[4] osteopenia[5] "with minimal lumbar spondylosis,"[6] chronic obstructive pulmonary disease, compressed fracture deformity of vertebra L1, degeneration of L3-L4 vertebra, levoscoliosis,[7] degeneration (arthritic)

---

[3]This claim is primarily directed at Defendant Martin.

[4]"A adrenal adenoma is a benign tumor of the glandular type (adenoma) in the adrenal gland." http://en.wikipedia.org/wiki/Adrenal_adenoma (6/4/2012).

[5]"Osteopenia is bone density that is lower than normal but above levels for osteoporosis. It increases the risk of developing osteoporosis. But having osteopenia does not mean you will get osteoporosis." http://www.webmd.com/osteoporosis/osteopenia-directory (6/4/2012).

[6]"Spondylosis is a term referring to degenerative osteoarthritis of the joints between the centra of the spinal vertebrae and/or neural foraminae." http://en.wikipedia.org/wiki/Spondylosis (6/4/2012).

[7]"Levoscoliosis is considered a form of scoliosis. The standard definition of scoliosis is the curvature of the spine in one direction or another. Levoscoliosis is the curvature of the spine to the left side of the body." http://scoliosisbrace.ca/levoscoliosis/ (6/4/2012).

left and right hip joints, BUN/Creat[inine] ratio[8] imbalance, a deformed and painful great toenail and glaucoma with cataracts." [Doc. 9-1, at 4-5.]

### Skidgel's Incarceration

In order to better understand the timeline of Skidgel's allegations, the Court asked Defendants to provide a brief summary of his incarceration.  In 1980, Skidgel was remanded to the custody of the New Mexico Corrections Department after he received a life sentence for first degree murder.[9] [Doc. 23, Ex. A, Affidavit of Compliance Administrator, at ¶ 4.] Over the years, Skidgel was incarcerated at a number of correctional facilities in New Mexico. [Doc. 23, Ex. B.] In August 2009, Skidgel was placed in Western New Mexico Correctional Facility ("WNMCF") after having been housed in Guadalupe County Correctional Facility ("GCCF"). [Id.]  Skidgel was incarcerated in NENMDF since June 9, 2011, where Defendant Martin is the Associate Warden. [Doc. 23, Exhibits B, C.] Skidgel's allegations against Martin and Phillips relate primarily to the time he was incarcerated at NENMDF but, as best as can be determined, the allegations against CMS relate to his incarceration at WNMCF and NENMDF.[10] [See Table 1, appended to this recommended disposition, listing medical records and grievances.]

[8]"Blood urea nitrogen to creatinine ratio (BUN:creatinine)  A BUN test may be done with a blood creatinine test. The level of creatinine in your blood also tells how well your kidneys are working-a high creatinine level may mean your kidneys are not working properly. Blood urea nitrogen (BUN) and creatinine tests can be used together to find the BUN-to-creatinine ratio (BUN:creatinine). A BUN to creatinine ratio can help your doctor check for problems, such as dehydration, that may cause abnormal BUN and creatinine levels."  http://www.webmd.com/a-to-z-guides/blood-urea-nitrogen (6/4/2012).

[9]In 2011, Skidgel was 60 years old.  He previously served in the Marines and Navy for a total of eight years, during which time he obtained his GED.  His second wife and children were the victims of his crime.  He had very few disciplinary reports during his decades of incarceration. [Doc. 26, Ex. A, 00043.]

[10]Skidgel's assertions of error regarding whether he was moved to NENMDF from GCCF or another facility, while perhaps accurate, are immaterial to the issues.  Similarly, Skidgel's "parole status" [Doc. 39, exhibit] is immaterial to the claims asserted.

## I.  **Summary Judgment Standard**

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party asserting an entitlement to summary judgment must support its assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A).  The Court may grant summary judgment in favor of the movant if the material facts are undisputed and show that the movant is entitled to judgment. Fed. R. Civ. P. 56(e)(2) and (3).

The moving party bears the burden of showing that no genuine issue of material fact exists. Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 979 (10th Cir. 2002); Muñoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000).  The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *See, e.g.*, Wade v. Emcasco Ins. Co., 483 F.3d 657, 660 (10th Cir. 2007). However, the opposing party may not rest upon mere allegations, denials, averments, or contentions in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is genuine if the evidence is "significantly probative" or "more than merely colorable" such that a jury could reasonably return a verdict for the non-moving party. Id. at 249-50. Mere assertions, conjecture, or the existence of a scintilla of evidence in support of the non-movant's position, are not sufficient to show a genuine issue of material fact; an issue of material fact is genuine only if the non-movant presents facts such that a reasonable jury could find in favor of the non-movant. Carpenter v. Boeing Co., 456 F.3d 1183, 1192 (10th Cir. 2006) (citations and quotations omitted).

6

"The purpose of a summary judgment motion is to assess whether a trial is necessary." Berry v. T–Mobile USA, Inc., 490 F.3d 1211, 1216 (10th Cir. 2007). "In other words, there 'must be evidence on which the jury could reasonably find for the plaintiff.' " Id.

## II.      Defendant Martin's Martinez report, briefing and attachments

[Doc. Nos. 20, 21, 23, 39, 42, 45.]     In his Martinez report, Martin asks for summary judgment on Skidgel's claims, as asserted against him, arguing that Skidgel did not present facts to demonstrate Martin violated Skidgel's constitutional rights, nor did Skidgel allege or present facts to show that a policy or custom of The GEO Group, Inc.[11] was the moving force behind any alleged violation.  Martin further states that Skidgel failed to exhaust his administrative remedies before filing suit and cannot recover damages for emotional distress. [Doc. 23, at 2.]

Skidgel's response to Martin's Martinez report argues, *inter alia*, that he demonstrated sufficient material facts to defeat summary judgment, that Martin's attached affidavit testimony contains erroneous facts, that Skidgel exhausted administrative remedies, and that Martin misconstrued evidence.  Skidgel summarily attempted to contradict many of Martin's assertions. [Doc. 39.]

In the reply, Martin asserts that Skidgel failed to raise a genuine issue of any material fact related to the request for summary judgment.  Upon further review, however, Martin withdrew his

---

[11]In Martin's Martinez report, he refers to The GEO Group, Inc. ("GEO") as his employer. [Doc. 23, at 8.] Martin further states that Union County, where NENMDF is located, contracts with the New Mexico Corrections Department ("NMCD") to house state prisoners. [Doc. 23, at 14, at ¶ 1.] Under the Agreement between NMCD and Union County, Union County contracted with GEO, a private prison contractor to operate the facility. [Doc. 23. Ex. C. at ¶ 20.] Skidgel states that GEO is not a named Defendant and that he does not allege wrongdoing on the part of GEO. [Doc. 39, at 3.] Thus, the Court does not address Martin's argument that Skidgel failed to allege or demonstrate that any policy or custom of GEO was the moving force behind any alleged violation of Skidgel's constitutional rights. [Doc. 23, at 20.] However, the Court observes, in passing, that it found no allegations by Skidgel that GEO's policies or customs led to constitutional violations.  Nor did Skidgel present evidence showing Martin violated any policy, custom, or practice in relation to Skidgel.

argument that Skidgel did not exhaust administrative remedies.  Thus, the Court neither decides nor addresses the issue of exhaustion as Martin essentially concedes exhaustion. [Doc. 42, at 7.]

Skidgel's unauthorized "answer" argues further that he raised genuine issues of material fact concerning claims against Martin and that Martin was personally in charge with respect to the lockdown and oversaw the operation.  According to Skidgel, Martin "orchestrated 'deviation from regular facility schedule' many times." [Doc. 45, at 2.]

## Claims Against Martin

*A.*     ***Alleged Due Process and Equal Protection Violations related to alleged placement of Skidgel in segregation from June 30, 2011-July 6, 2011, without affording Skidgel a disciplinary hearing or access to a disciplinary appeal***

### *1.     Pertinent Legal Standard*

It is well established that an inmate does not lose all his constitutional rights when he enters a prison.  *See, e.g.,* Pell v. Procunier, 417 U.S. 817, 822 (1974); Bell v. Wolfish, 441 U.S. 530, 545-47 (1979); Boles v. Neet, 486 F.3d 1177, 1180 (10th Cir. 2007) (court noted that a "delicate balance ... has been recognized between prisoners' constitutional guarantees and the legitimate concerns of prison administrators" and that prisoners' constitutional rights may be limited by restrictions which are reasonably related to legitimate penological concerns).   Infringements on prisoners' constitutional rights must not be "arbitrary or irrational," nor an "exaggerated response" to security needs.  Turner v. Safley, 482 U.S. 78, 90 (1987).

However, courts are extremely deferential to the decisions made by prison administrators, recognizing that:

> [r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of

8

> those branches, and separation of powers concerns counsel a policy
> of judicial restraint.

Id. at 84-85.  The United States Supreme Court further explained that, because the function of

disciplinary action in a prison or correctional facility is managerial rather than retributive, prison

officials are accorded broad discretion in regulating the prisoner population.  Sandin v. Conner, 515

U.S. 472, 486 (1995).

Stated differently, prison officials have wide discretion to determine measures to be taken

to preserve order and security in a detention facility.  *See id.* at 84-85, 90.  "[A] prison's internal

security [, for example,] is peculiarly a matter normally left to the discretion of prison administra-

tors."  Rhodes v. Chapman, 452 U.S. 337, 349 n. 14 (1981).  *See, e.g.,* Bell, 441 U.S. at  547

(holding that prison administrators should be accorded wide-ranging deference in the adoption and

execution of policies and practices that in their judgment are needed to preserve the internal order

and discipline and to maintain institutional security).  As a result, courts should approach security,

discipline, and prison administration with a degree of caution, circumspection, and reticence.  *See*

Block v. Rutherford, 468 U.S. 576, 593-94 (1984) ("courts unquestionably should be reluctant to

second-guess prison administrators' opinions about the need for security measures").

### 2.     *Material Facts*

Skidgel contends that his due process and equal protection rights were violated when Martin

ordered Skidgel and four other inmates to be placed in segregation on June 30, 2011 until July 6,

2011, without any means for Skidgel to challenge "the lockdown or the sanctions imposed . . . ."

[Doc. 9-1, at ¶ 5.]  Skidgel further asserts that Martin violated state and federal law, the American

Correctional Associations Standards, Corrections Department Policy on Disciplinary Placement, and

the GEO Facility Handbook.  Skidgel alleges that Martin's "total indifference" to his rights was

"grossly unconstitutional." [Id.]

> More specifically, Skidgel claims:

>> On June 30, 2011, nearly 30 inmates were being discharged from the orientation POD, Housing Unit 1-E POD.  I was among those being placed in general population.  On finding that not enough empty bunks were available for such a move, I was returned to housing unit 1-E POD for institutional count with the understanding that those of us being returned (approximately 5) would be moved to general population.  Myself and another inmate were placed in housing unit 1-E POD Cell 214 and served the GEO-NENMDF lockdown schedule "Notice to Offender" (See Exhibit #1).  I was refused a misconduct report and no hearing on the misconduct.  I was not allowed a written report nor the opportunity to challenge evidence against me or to present evidence in my defense, in violation of law. I attempted a disciplinary appeal on 7/8/11 (See Grievance 8-11-10). Said appeal was destroyed.

[Id.] Skidgel attached a Notice of Claim (in accordance with the New Mexico Tort Claims Act) to

his complaint and filed a supporting brief. [Doc. Nos. 9-1, attached Notice of Claim; Doc. 9-3.] Both

pleadings describe similar allegations against Martin concerning the alleged "lockdown,"

segregation, or sanction against Skidgel, occurring on June 30, 2011. [Doc. 9-3.] Skidgel adds that

Martin deliberately subjected Skidgel to cruel and unusual punishment, and that such actions caused

injuries to his physical and mental well being.  He argues that Martin was "totally indifferent" to

Skidgel's civil rights and that Martin relied on "security needs that did not exist."

In Skidgel's response to Martin's Martinez report, he alleges that he was assigned to a top

bunk bed during the pertinent time frame and, contrary to medical needs, was not assigned a bottom

bunk bed. [Doc. 39, at 2.] Skidgel further asserts that on June 30, 2011 through July 6, 2011, he was

"segregated for punishment reasons as having been found guilty of disruptive behavior. . . ."  To the

extent that Martin's affidavit differs from Skidgel's version of the events, Skidgel argues that Martin "intentionally misconstrued" the facts and hid evidence behind a claim of "in camera review."

Martin provided the Compliance Administrator's affidavit testimony that Skidgel was transferred to NENMDF on June 9, 2011, from another corrections facility. [Doc. 23, Ex. A, Compliance Administrator Aff., at ¶ 5.] Upon arriving at NENMDF, Skidgel was placed in "Housing 1 E-103 B, which is an orientation pod." [Id., at ¶ 6.] On the morning of June 30, 2011, an attempt was made to move Skidgel to Housing 2 C-101 B, which is within the general population of NENMDF. [Id., at ¶ 7.] But, Skidgel was returned to Housing 1-E-214 T in the orientation pod at 12:20 p.m. on June 30, 2011 and remained there until he was moved to Housing 2 A103 B on July 6, 2011. [Id., at ¶¶ 8-9.] Skidgel has remained in Housing 2 since July 6, 2011, although he has been moved between various pods within that unit and has had several different cell assignments.

The Compliance Administrator further testified that Skidgel has not been housed in segregation at any NMCD facility since 2006, when he was incarcerated at Lea County Correctional Facility. He has never been housed in segregation in NENMDF. [Id., at ¶¶ 11, 12.] Skidgel continued to accrue good time from June 30, 2011 to July 6, 2011. He had a cell mate during that same time frame, and therefore, was not segregated from inmates. [Id., at ¶ 14.]

Martin, the Associate Warden at NENMDF, also provided affidavit testimony concerning the incident in question. He stated that Skidgel, along with other recently transferred inmates, was scheduled to be moved from the orientation pod to a housing unit in the general population on June 30, 2011. [Doc. 23, Ex. C, Martin Aff., at ¶ 3.] However, during the move, it was discovered that the facility had insufficient empty bunks in the general population to house all of the inmates being transferred. [Id., at ¶ 4.] Thus, Skidgel and several other inmates were returned to the orientation pod

11

until additional bunk space was available. [Id., at ¶ 5.] Skidgel and another inmate shared a cell in the orientation pod; they were not in segregation during the pertinent frame. [Id., at ¶ 6.]

Martin further explained that an unrelated security event at NENMDF occurred on the evening of June 29, 2011.  The security event required a number of other inmates to be removed from the general inmate population.  An incident report was prepared to document that event, but the report contains sensitive information concerning gang affiliations and the facility's response to the incident, and was not disclosed to Skidgel or the general public.  Martin stated he would provide the report to the Court for an *in camera* inspection if needed. [Id., at ¶ 7.] The Court does not find it necessary to review the report.

Due to the lack of space in the segregation unit, some of the inmates involved in the June 29, 2011 security incident were placed in the orientation pod, where Skidgel was housed.  The entire pod was then locked down for security reasons related to the June 29 incident. [Id., at ¶¶ 8-9.] At this time, inmates in the orientation pod, including Skidgel, were confined to living quarters, but they had access to facility programs, including medical and educational resource departments.  [Id., at ¶ 10.]

Martin testified that he was familiar with and has personal knowledge of the policies and procedures at issue.  The disciplinary appeal process applies when an inmate is placed in disciplinary segregation for suspicion of participating, or for participating, in any major or minor level incident. Skidgel was not entitled to any process to challenge the lockdown because the lockdown addressed an unrelated security concern, and was not imposed "to punish Skidgel for committing any disciplinary infraction." [Id., at ¶¶ 11-13.] During the lockdown, Skidgel continued to accrue good time credit.  No disciplinary sanctions were imposed against him. [Id., at ¶ 14.] Neither Martin nor

any employee of NENMDF has a copy of the Skidgel's alleged disciplinary appeal he claims to have submitted on July 8, 2011. [Id., at ¶ 15.]

Attached to Martin's affidavit is a document entitled "GEO-NENMDF LOCKDOWN SCHEDULE – NOTICE TO OFFENDERS." [Doc. 23, Ex. C-1.] The document advises inmates, in part, that they have been placed on a lockdown status "because of disruptive behavior *or for security reasons*" (emphasis added).  The document explains what activities are allowed.  The document confirms that lockdowns can occur for reasons other than disciplinary actions.

     *3.*     *Analysis*

Skidgel's response and answer to Martin's Martinez report, along with his attachments to other pleadings, fail to raise a genuine issue of material fact with respect to his claims of constitutional violations by Martin during the alleged lockdown of June 30, 2011-July 6, 2011. [Doc. 42, 45.]  Skidgel provides no specific facts demonstrating that he was placed in segregation from June 30, 2011-July 6, 2011, as a result of misconduct or for purposes of discipline.  He never identifies what alleged disruptive behavior he engaged in at NENMDF or what actual punishment was inflicted upon him based on any type of misconduct.  Indeed, the undisputed evidence is to the contrary.  Skidgel was not in administrative segregation.  He was taken to or remained in the orientation pod due to a lack of bedspace.

Skidgel does not dispute that there was a lockdown in place in response to an unrelated security issue, beginning on June 29, 2011.  He makes no mention of the unrelated security event, and instead, relies on only conclusory assertions that he was subjected to "lockdown conditions" as a sanction for his purported misconduct and that Warden Martin is hiding evidence or misconstruing evidence.  Skidgel's mere assertions, contentions, and denials are insufficient to raise issues of material facts in relation to any of his constitutional claims against Martin, regarding the lockdown

13

incident.  *See* S.E.C. v. Smart, --- F.3d ----, 2012 WL 1450424, *5 (Apr. 27, 2012) ("A properly submitted summary judgment motion cannot be defeated by 'mere allegation[s] or denials.'") (internal citation omitted).

The undisputed evidence provided by Martin and the Compliance Administrator is that Skidgel was never placed in segregation or lockdown as a result of misconduct at NENMDF.  He suffered no loss of accumulation of good time credit during the pertinent time frame.  Had he been in administrative segregation, he would not have accrued good time credits.  Skidgel provides no allegations or evidence of restrictions he encountered during the lockdown.  Moreover, if Skidgel filed a grievance or complaint concerning this incident that ultimately was lost or destroyed, it is of no consequence under these circumstances where he was not disciplined.  Stated differently, Skidgel had nothing to grieve in terms of disciplinary action taken against him by Martin from June 30, 2011 to July 6, 2011.[12]

Even if Skidgel's seven-day long alleged lockdown or segregation were punitive in nature, for which there is no evidentiary support, neither his due process nor equal protection rights are implicated.  With respect to an inmate's segregation away from the general prison population, due process is implicated only where an inmate is subjected to a restraint that imposes an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life."  *See* Sandin, 515 U.S. at 484 (internal citation omitted).  A week-long period of segregation does not impose an atypical or significant hardship if it simply restricts privileges available to inmates in the general population.

---

[12]The grievances and informal complaints filed by Skidgel relating to this time frame and lockdown incident do not challenge the fact of the lockdown. [Doc. 23, Exhibits D-1 to D-4.]  They are discussed in further detail below.

*See* Penrod v. Zavaras, 468 U.S. 576, 1407 (10th Cir. 1996); Beverati v. Smith, 120 F.3d 500, 504 (4th Cir. 1997) (six months of administrative segregation was not atypical, even with restrictions). Moreover, Skidgel provided no evidence to show he suffered significant or atypical restrictions in relation to ordinary prison life.

Similarly, Skidgel raised no genuine issues of material fact regarding his allegations that the lockdown violated his equal protection rights. For example, he provided no evidence to show that he was singled out and treated arbitrarily during the seven-day period at issue. He did not demonstrate that similarly situated inmates were not administratively segregated on the days in question. Indeed, the evidence shows that other inmates who were housed in the orientation pod during this period were similarly restricted due to the same unrelated security concerns.

Because Skidgel cannot claim a fundamental right or differential treatment based on a suspect classification, he must allege and show that his treatment on the dates in question was not reasonably related to some legitimate penological purpose. *See* Templeman v. Gunter, 16 F.3d 367, 371 (10th Cir. 1994). This, he cannot do. Martin provided unrefuted evidence that a security incident occurred at NENMDF on June 29, 2011, that required the removal of a number of inmates from the general population to be placed in the orientation pod where Skidgel and a few other inmates were housed. Because of the lack of space in the segregation unit, these other inmates had to be placed in the orientation pod, at which time that pod was placed on lockdown for security reasons unrelated to Skidgel's conduct. All inmates in the orientation pod were subjected to lockdown conditions. But Skidgel and others retained access to facility programs, the medical department, and the educational resource department. [Doc. 23, Ex. C.]

Unquestionably, a corrections facility may place a pod on lockdown for legitimate penological purposes, including security reasons. The security of a detention facility is a legitimate

penological concern.  *See, e.g.,* <u>Pell</u>, 417 U.S. at 823.  *See, e.g.,* <u>Jones v. North Carolina Prisoners'</u> <u>Labor Union</u>, 433 U.S. 119, 128 (1977) ("Because the realities of running a penal institution are complex and difficult, we have also recognized the wide-ranging deference to be accorded the decisions of prison administrators.").  Given the deference afforded prison officials to make necessary administrative and security-related decisions, a court will neither substitute its judgment nor interfere with decisions made regarding penological concerns.  *See, e.g.,* <u>Lewis v. Casey</u>, 518 U.S. 343, 386-87 (1996) ("courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.  Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.") (internal citations omitted).

Finally, to the extent that Skidgel may assert that he had a liberty interest in being placed in the general prison population, any such claim would fail.  *See* <u>Templeman</u>, 16 F.3d at 369 (an inmate is not entitled to a particular degree of liberty in prison); *see also* <u>Alvarez v. McCormac</u>, 15 F. App'x 759, 760 (10th Cir. Aug. 7, 2001) (unpublished) (prisoner "did not have a constitutionally-protected liberty interest under state law that would prevent his twenty-day segregation, since such a sanction did not impose an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'") (internal citation omitted).

For all of the reasons stated above, the Court determines that Skidgel failed to raise genuine issues of material fact concerning Martine's alleged violations of federal constitutional rights, including Skidgel's due process, equal protection, or liberty rights as to the June 30, 2011-July 6, 2011 lockdown.  Therefore, the Court recommends that such claims, as asserted against Martin, be dismissed, with prejudice.

16

**B.** **_Alleged Eighth Amendment Violations based on lockdown and cancellation of medical appointment_**

**1.** **_Legal Standard_**

To establish an Eighth Amendment violation, an inmate must provide evidence satisfying two prongs: (1) an objective showing of a sufficiently serious deprivation; and (2) a subjective showing that Martin knowingly disregarded an excessive risk to a prisoner's health or safety. Farmer v. Brennan, 511 U.S. 825, 834 (1994).

In Boles v. Newth, 2012 WL 1593004, *3 (10th Cir. May 8, 2012) (unpublished), the Tenth Circuit Court of Appeals explained –

> Deliberate indifference "involves both an objective and a subjective component." Id. (quotation omitted). For the objective component, a prisoner must provide "evidence that the deprivation at issue was in fact sufficiently serious." Id. (quotation omitted). The subjective component requires "evidence of the prison official's culpable state of mind," which may be fulfilled by showing that the official "[knew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference." Id. (brackets and quotation omitted).

The Tenth Circuit further observed that "[a] prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment." Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005). However, "a delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." Id.

**2.** **_Material Facts_**

Skidgel provides no specific allegations to support his claim that Martin violated Skidgel's Eighth Amendment rights in relation to the June 30, 2011-July 6, 2011 lockdown. For example, he neither alleged a "sufficiently serious deprivation" nor that Martin knowingly disregarded an

17

excessive risk to Skidgel's safety or health.  Instead, Skidgel summarily argues that Martin's conduct was "cruel and unusual" and that Martin "injured him." [Doc. 9-3, at 4.] "Martin's deliberate subjection of Plaintiff to cruel and unusual punishment constitutes an injury to his physical and mental well being . . . ." [Id.] Such allegations are insufficient.  *See, e.g.,* Mata, 427 F.3d at 751 (substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain.") (internal citation omitted).

Martin provided evidence showing that Skidgel was housed in the orientation pod instead of in the general population during the pertinent week. [Doc. 30, Ex. C.]  However, he was not segregated from the inmate population, as he had a cellmate.  Both medical and educational resource departments conducted regular rounds in the orientation pod.  Skidgel continued to accrue good-time credits.  He was then transferred into the general population as soon as a space became available, and spent no longer than seven days during the security-related lockdown.

Regarding the cancellation of a single medical appointment on July 28, 2011,[13] Skidgel alleges that Martin placed the institution on restricted movement status to allow for a religious presentation by a well-known celebrity thereby causing the cancellation of a long-scheduled medical appointment. [Doc. 9-1, at 3.] Skidgel further stated that he had waited for this appointment since June 9, 2011, had suffered in pain, and was required to wait another 4 to 6 weeks for a doctor's appointment. [Doc. 9-1, at 4.] "This loss of a medical appointment for treatment of a great many injuries and diseases violates my civil rights to treatment for my medical needs . . . ." [Id.] Skidgel also contends that he had already waited "some 48 days" to see a health care provider for the "needed pain medications, prescriptions, a back brace . . ., permit for bottom bunk, treatment for

---

[13]To some extent, this claim regarding a missed medical appointment overlaps with claims against Defendants Phillips and CMS and is discussed in more detail below.

bone diseases of arthritis, levoscoliosis, osteopenia with lumbar spondylosis as well as abnormal Bun/Creat ratios. Denying this appointment has injured Plaintiff physically as well as mentally." [Doc. 9-3, at 16.] The cancelled appointment was to "further address the unknown respiratory disease and to address the current condition of 2 adrenal tumors." [Id.]

Martin argues there is no evidence that he acted with deliberate indifference to Skidgel's medical needs as required to prove a claim under the Eighth Amendment. Martin supplied evidence that he did not know Skidgel had an "important medical appointment" on the date in question. Moreover, there is no evidence to establish that Martin ordered the deviation in schedule on July 28, 2011, for reasons that were unnecessary or ill-founded. Indeed, Martin testified that a deviation in the facility's schedule was required to ensure the security of the facility while allowing inmates to attend the event. [Doc. 39, at 5; Doc. 42, Ex. K.] Scheduling decisions of this nature, especially when linked to overriding safety and security concerns, are uniquely the province of prison administrators, and courts will not interfere with those penological decisions. *See, e.g.*, Lewis, 518 U.S. at 386-87; Jones, 433 U.S. at 125 (courts must give "appropriate deference to the decisions of prison administrators"); Procunier, *supra*, at 405 ("[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform"). There is no evidence that Martin ordered the deviation in schedule because Martin wanted Skidgel's medical appointment to be canceled.

Skidgel asserts that Martin's admission that there was a deviation from the facility schedule, due to a concert and motivational speech given by Sheila Raye Charles (daughter of Ray Charles), is sufficient to show deliberate indifference by Martin. In Skidgel's "answer" to the reply, he summarily asserts that Martin "had full knowledge and record of the cancellation of appointments, classes, recreation and all other movement by inmates unless he orders his staff to do differently."

19

"Evidence of missed medical appointments are contained in the infirmary officers duty log which is submitted to the security warden daily." [Doc. 45.]

### 3.    Analysis

The Court concludes that no genuine issues of material fact exist with respect to either of Skidgel's Eighth Amendment claims against Martin, *i.e.,* the lockdown between June 30, 2011-July 6, 2011, or the cancellation of a single medical appointment on July 28, 2011 due to a scheduled event at the facility.  First, a seven-day lockdown, during which Skidgel continued to receive facility services and accumulate good-time credits, does not constitute a "sufficiently serious deprivation" for purposes of demonstrating cruel and unusual punishment.  Similarly, the cancellation of a single medical appointment, due to the scheduling of an event that required a deviation from the facility's schedule for safety and security purposes, does not amount to a "sufficiently serious deprivation."  This is especially true in view of evidence showing Skidgel received ample medical attention while in the facility. [*See, e.g.,* Table 1 appended to this Recommended Disposition.]

In addition, other than summary and self-serving assertions, Skidgel provides no evidence that Martin acted "with deliberate indifference to [his] health or safety" with respect to either of the two incidents.  Skidgel, for example, did not supply evidence to rebut Martin's showing that the lockdown occurred due to security concerns and that Skidgel was not punished for any type of misconduct in relation to the lockdown.  Skidgel did not demonstrate that his health of safety were impacted by the lockdown.  Skidgel also failed to provide evidence that Martin "knew of" and "disregarded an excessive risk" to Skidgel's health or safety with respect to the lockdown or the cancellation of a single medical appointment.  Moreover, the evidence in this case does not demonstrate that Skidgel made a specific request for medical attention that was communicated to Martin, who then deliberately refused or ignored the request.

20

Courts have reviewed more serious allegations and found that inmates failed to state a claim under the Eighth Amendment. *See, e.g.,* Branham v. Meachum, 77 F.3d 626, 631 (2nd Cir. 1996) (no Eighth Amendment claim where inmate alleged he was required to shower while wearing leg irons during a lockdown); LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993) (requiring inmate who assaulted prison guards and fellow inmates to shower while wearing handcuffs and ankle shackles did not state a claim under Eighth Amendment). The events supporting Skidgel's alleged Eighth Amendment violations involved no identifiable injury to Skidgel and could not even be described as harsh conditions, let alone "punishment . . . involving the infliction of unnecessary and wanton pain." *See* Rhodes, 452 U.S. at 347.

As stated previously, prison officials have wide discretion to determine what measures should be taken to preserve order and security in a detention facility. Martin's decisions, to the extent they were his alone, to place the orientation pod on lockdown for a temporary period of seven days and to cancel a single medical appointment of Skidgel's, were related to legitimate and reasoned security or safety concerns. There is no indication that Martin acted maliciously or with deliberate indifference to Skidgel's alleged serious medical needs. Thus, the Court recommends that Skidgel's Eighth Amendment claims against Martin be dismissed, with prejudice.

### III.   Defendants Phillips' and CMS's Martinez report, briefing, and attachments
[Doc. Nos. 20, 21, 24, 41, 44, 46, 49.]

In their Martinez report, Defendants Phillips and CMS (private company with which the New Mexico Corrections Department contracts to provide medical services) ("Defendants")[14] summarize

---

[14]Phillips is a Health Services Administrator at NENMDF, employed by CMS; she responded to many of Skidgel's informal complaints. [Doc. 33-2, Ex. P, Phillips' Aff. at ¶ 3.] CMS is a private company with which the New Mexico Corrections Department contracts to provide medical services at NENMDF. [Doc. 23, Ex. C, Martin Aff. at ¶ 19.]

Skidgel's claims against them as being: (1) Eighth Amendment violations for cruel and unusual punishment based on medical conditions/treatment and lack of accommodation; (2) alleged violations of standards of the American Correctional Association, New Mexico Corrections Department Policies, the Healthcare Systems Bureau, and the GEO Group, Inc. NENMDF Inmate Handbook, in relation to allegations concerning medical treatment and conditions; (3) CMS's violation of its contract with NMCD based on three occurrences concerning medical treatment, appointments, or requested medical results; (4) violation of Skidgel's right to medical treatment specific to eight different occurrences; (5) medical negligence; (6) harassment and retaliation; and (7) withholding Skidgel's medical records.

In response to the Court's order directing that they produce a <u>Martinez</u> report, Defendants provided an outline of the pertinent dates concerning Skidgel's claims, a summary of Skidgel's claims against them and the defenses to each cause of action,[15] affidavits, and voluminous exhibits, primarily documenting Skidgel's medical treatment. [Doc. Nos. 24-35.] Defendants seek summary judgment on all of Skidgel's claims as asserted against them.

Skidgel's argues, *inter alia,* in his response that Defendant Philips is liable for violations of "contract requirements and policies" by virtue of the doctrine of *respondeat superior*, "(NMSA 9178 § 41-5-16(c))." [Doc. 41, at 1.] Skidgel claims that Defendants provided false statements and, on occasion, refers to New Mexico statutory provisions and to Skidgel's grievances. He also asserts that many of Defendants' contentions require no answer, or he summarily takes issue with certain assertions and exhibits. [Doc. 41.]

_____

[15]These Defendants also withdrew their defense regarding exhaustion of administrative remedies, as it related to issues of timeliness. [Doc. 46, at 2.]

22

Skidgel sets forth conclusory assertions, *e.g.,* that Defendants were deliberately indifferent to his medical needs.  He relies on unsupported argument about medical treatment as far back as 1990. [Doc. 41, at 7.] He claims he did not receive certain of Defendants' exhibits.  Skidgel attaches a number of exhibits to his response.  [Doc. 41-1.]

In Skidgel's unauthorized supplemental response [Doc. 44], he advises that he received the exhibits he initially claimed were not provided to him.  He then addresses those exhibits.  He disputes Defendants' physician's affidavit addressing standard of care and argues that the <u>Merck Manual of Diagnosis and Treatment</u> sets forth the proper standard of medical care. [Doc. 44, at 1-2.] Skidgel further asserts that many of Defendants' exhibits require no response or provide no material evidence to support Defendants' claims/defenses.

In Defendants' reply, they argue, *inter alia*, that Skidgel failed to contest most of their material facts, which should, therefore, be deemed admitted.  In addition, they assert that Skidgel's reliance on New Mexico Medical Malpractice Act, § 41-5-5 has no merit or relevance and should be disregarded as Defendants are not "qualified healthcare providers." [Doc. 46, at 3.] Even if the Act were applicable, Defendants contend that Skidgel failed to show he is entitled to any relief for his allegations in accordance with the Act.

To the extent that Skidgel argues Defendants admitted to losing some of Skidgel's medical records, Defendants state they have made all records available.  Defendants disagree that they admitted certain medical records were missing.  [Doc. 46, at 4.] Defendants continue to argue they are entitled to summary judgment and dismissal of all Skidgel's claims.

## Claims Against Defendants Phillips and CMS

**A.**     ***Alleged Eighth Amendment Violations***

     ***1.***     ***Pertinent Legal Standard***

"A prison official violates an inmate's clearly established Eighth Amendment rights if he acts with deliberate indifference to an inmate's serious medical needs—if he knows of and disregards an excessive risk to inmate health or safety." Garrett v. Stratman, 254 F.3d 946, 949 (10th Cir. 2001) (internal quotations omitted). In addition, to prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must show that he suffered harm sufficiently serious to implicate the Cruel and Unusual Punishment Clause. Callahan v. Poppell, 471 F.3d 1155, 1159 (10th Cir. 2006).

"[A]ccidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment of a medical condition do not constitute a medical wrong under the Eighth Amendment." Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981) (*citing* Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)). "*A fortiori*, a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. Id. (internal citations omitted).

The Tenth Circuit further explained:

> The two-pronged Estelle standard "requires deliberate indifference on the part of prison officials and it requires the prisoner's medical needs to be serious." A medical need is serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment.

24

Id. (internal citations omitted).

It is important to note that an inmate's belief that he should have received different or better treatment is not, by itself, evidence of an Eighth Amendment violation or of deliberate indifference to serious medical needs. *See* Green v. Branson, 108 F.3d 1296, 1304 (10th Cir. 1997) ("We are persuaded that a showing of deliberate refusal to provide medical attention, ***as opposed to a particular course of treatment***, coupled with falsification of medical records may give rise to an Eighth Amendment violation and is cognizable under 42 U.S.C. § 1983.") (emphasis added)); Dulany v. Carnahan, 132 F.3d 1234, 1240 (8th Cir.1997) ("[A] prison doctor remains free to exercise his or her independent professional judgment and an inmate is not entitled to any particular course of treatment.") The fact that an inmate may prefer or believe that another course of treatment is better or warranted is not evidence of a constitutional violation.  Perkins v. Kansas Dep't of Corr., 165 F.3d 803, 811 (10th Cir. 1999) ("[a] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation.") (internal citation omitted).

### a)      Use of Top Bunk Bed Without Ladder

#### *1.      Material Facts*

Skidgel contends that Defendants disregarded his arthritic hips and double hernia when he was required to use a top bunk without a ladder.  He further alleges such treatment amounted to cruel and unusual punishment in violation of the Eighth Amendment.

Defendants deny that these alleged medical conditions amount to "serious medical needs," that they were diagnosed by a physician as mandating certain treatment, or that they were so obvious even a lay person would easily recognize the necessity for medical attention.  In addition, Defendants argue that Skidgel did not provide evidence showing the alleged offenders knew of or disregarded an excessive risk to Skidgel's health or safety, or that Skidgel suffered harm as a result

of using a top bunk without a ladder.  Defendants note that the radiology reports discredit any issues with Skidgel's hip and in fact, assessed a normal hip.  Additionally, Defendants found no medical records noting a double hernia or any of Skidgel's HSRFs that sought medical attention for a double hernia. [Doc. 24, at 15-16.] Defendants also argue that Skidgel filed no grievances concerning this matter and that the claim is unexhausted.

Skidgel refers to his brief in support of his complaint and to evidence he attached to his response to the <u>Martinez</u> report. [Doc. 41, at 6-8.] His supporting brief [Doc. 9-3, pp. 20-22] provides unsubstantiated and conclusory argument, *e,g.,* that "CMS is in the custody of more than 32 years of health care records especially those MRI's and laboratory reports and the radiology reports showing the tumors, broken bones (ribs, back) the result of bone diseases, a double hernia, and a[n] undiagnosed pulmonary disease."  "CMS refuses to provide adequate staffing to provide medical care to Plaintiff . . . ."  Defendants' actions have resulted in "Plaintiff's pain and suffering, aggravating and causing greater injury to spine, lungs and joints." [Doc. 9-3, pp. 20-22.]

The documents Skidgel attached to his response [Doc. 41-1] indicate only that a hernia was repaired in 2007. [Table 1, appended, 6/22/09 entry.] These records do not indicate that Skidgel had double hernias in 2009-2011 that had gone unrepaired or that his hips were problematic.  While Skidgel complained of hip pain after a fall on September 25, 2009, a physician prescribed him pain medication on October 9, 2009. [Table 1, entries of 9/26/09 and 10/9/09.] While he requested a CT scan of his hips in February 2010, and again complained of left hip pain in August 2011, the x-ray of his left hip in August 2011 was normal.  No fractures were indicated. [Table 1, entries of 2/18/10, 8/1/11, 8/14/11.] Moreover, it is important to note, that during this time frame, Skidgel refused treatment on a number of occasions. [Table 1, entries of 12/15/09, 12/22/09, 4/1/09, 7/6/11.]

26

### 2. *Analysis*

As stated previously, "a medical need is serious if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  Here, the evidence is undisputed that neither Skidgel's hip condition nor hernia were serious conditions sufficient to meet the legal standard. In addition, Skidgel did not produce evidence that prison officials prevented him from receiving recommended treatment or denied him access to medical care capable of evaluating the need for treatment.  Any treatment for his "normal" hip or his alleged hernia that had been repaired years earlier were not indicated.  Moreover, Skidgel's contention that he should have received different or better treatment is not evidence sufficient to demonstrate an Eighth Amendment violation.

Skidgel failed to raise genuine issues of material facts with respect to either of the two required prongs to prevail on an Eighth Amendment claim.  Thus, his claims concerning the use of a top bunk bed without a ladder are subject to dismissal.[16]

### b) **Inadequate Medical Care and Delays Related to Medical Appointments**

The Court construes Skidgel's allegations concerning inadequate medical care, treatment, and diagnoses of his conditions, a canceled medical appointment, and delays in medical appointments to attempt to raise Eighth Amendment claims against these Defendants and/or Defendant Martin.  The applicable standard concerning Eighth Amendment violations is set out above.

---

[16]Based on this finding and recommendation, the Court does not reach the exhaustion argument. Moreover, it could be that his October 9, 2009 grievance may have contemplated his allegations concerning hip pain although there was nothing specifically alleged about assignment of bunk beds. [Table, 10/9/09 grievance-Event 1.]

###### 1.      *Material Facts*

As discussed *supra*, Skidgel contends that he did not receive adequate medical treatment or proper diagnoses for his many medical conditions.  For example, he believes he should have received a back brace at NENMDF and needed a physician's appointment to "further address the unknown respiratory disease and to address the current condition of -2- adrenal tumors.  Having waited for 48 days without treatment as the evidence shows is injurious and a violation of civil rights." [Doc. 9-3, at 16.] Skidgel asserts that inmates are required to sit in a waiting room 11.5 feet by 17 feet with 9 large plastic chairs and limited ventilation while waiting two hours or more to see health care providers on numerous occasions. [Doc. 9-3, at 21.]  He also complains of a canceled medical appointment on July 28, 2011, and his long wait for the rescheduled appointment.

###### 2.      *Analysis*

Based on the medical record evidence, Skidgel's numerous ailments are not nearly as serious as alleged.  In other words, Skidgel fails to satisfy the first prong of an Eighth Amendment violation, by providing evidence of a "sufficiently serious deprivation."

First, regarding his adrenal masses, testing in June 2006, indicated carcinoma could not be ruled out. [Table A, entry of 6/15/06.] By January 2008, it was determined that MRI findings were consistent with benign adrenal adenomas, one of which was "relatively tiny."  Both were stable. [Id., entry of 1/7/08.] Regarding Skidgel's hernias, the records indicate that a hernia was repaired in 2007. [Id., entry of 6/22/09.] His heart was normal and his lungs were clear. [Id.] An x-ray in 2007 showed an old compression fracture in his back and "slight degeneration at level L3-4.  He had curvature of the spine on the left side. [Id., entries of 6/22/09, 7/16/09.]

He was treated for psychiatric issues upon his arrival at WNMCF in August 2009. [Id., entry of 8/18/09.] A thicker mattress and new boots helped his back pain. [Id.] His back only hurt if he

tried to exercise or do more than walk. [Id., entry of 9/22/09.]  When his labs were drawn in September 2009, everything was in the normal range except his Bun/Creat ratio was noted as a little low.  A low Bun/Creat ratio may indicate dehydration. [Id., entry of 9/10/09.]

In 2010, it was noted that Skidgel continued to complain of the same health concerns, *e.g.,* adrenal masses that were found to be benign. [Id., entry of 2/19/10.] In 2011, his lab work was again mostly normal, with a low Bun/Creat ration, high cholesterol, and low vitamin D. [Id., entry of 5/18/11.] An x-ray of his back revealed aligned lumbar vertebra, degenerative osteophytic spurring and moderate osteoporotic compression involving T12 vertebra. [Id., entry of 5/31/11.] A chest x-ray indicated no active disease and that his pulmonary functions were okay.  Skidgel's cardiac silhouette was normal. [Id., entry of 6/17/11.]

It is true that, in July 2011, medical personnel found no need to issue Skidgel a back brace, although he had previously been dispensed a back brace. [Id., entry of 7/8/11.] Skidgel was prescribed Zoloft for major depression in July 2011, but, by early August 2011, he no longer wished to take Zoloft and was noted as doing fine without it. [Id., entries of 7/11/11, 8/3/11, 8/15/11.]

While Skidgel complained of hip pain on August 10, 2011, an x-ray of his hip on August 14, 2011, indicated a normal hip with no fracture. [Id.] Skidgel also alleged a serious condition of osteopenia, but that is merely a potential precursor to the more serious condition of osteoporosis, with which Skidgel was not diagnosed.

Based on this extensive medical record, there is no objective showing of a sufficiently serious deprivation.  Moreover Skidgel provided no evidence that Defendants knowingly disregarded an excessive risk to Skidgel's health of safety, as is documented by the medical treatment requested and received by Skidgel.

Skidgel made repeated requests for health care and that he was seen and treated by health care providers regularly, as discussed above. The attached Table, sets forth summaries of Skidgel's requests for health care and treatment. For example, upon Skidgel's transfer to WNMCF in August 2009, he was seen on August 18, 2009 for screening. He requested health care services on August 20, 2009, and was seen the next day. A back brace was dispensed on August 24, 2009. Skidgel made another health care request on August 26, 2009, and he was seen the next day. He had labwork done in early September 2009. He sought health services on September 11, 2009, for a skin rash and was seen and treated on September 22, 2009. He was seen on September 22, 2009 at the chronic disease clinic where a detailed medical history was taken. [Table A.]

Skidgel also refused medical care services on numerous occasions. [Table A, entries of 12/15/09, 12/22/09, 4/1/10.] He had a vision exam on December 21, 2009, and a dental appointment on January 13, 2010. [Id.] He submitted health services requests on February 18, 2010 and was seen on February 19, 2010. [Id.]

With respect to medical care provided in 2011, he was seen more than once in May, June, July, August, September, and October. [Table 1, entries of 5/4/11, 5/11/11, 5/18/11, 5/31/11, 6/3/11, 6/14/11, 6/17/11, 6/29/11, 7/8/11, 7/11/11, 8/3/11, 8/4/11, 8/10/11, 8/14/11, 8/15/11, 8/16/11, 8/18/11, 9/12/11, 10/4/11, 10/5/11.]

In sum, Skidgel failed to produce evidence of inadequate medical care to satisfy requirements of an Eighth Amendment violation. His medical care was promptly provided and comprehensive in nature. Moreover, the fact that Skidgel disagreed with the treatment or diagnoses, *e.g.,* failure to prescribe a back brace, does not demonstrate an Eighth Amendment violation. *See* Ramos, 639 F.2d at 575 ("a mere difference of opinion between the prison's medical staff and the

30

inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment").

The same is true with respect to Skidgel's claims that he suffered constitutional violations because of having to wait in a crowded room for two hours or more to be seen by health care providers and that one long-awaited medical appointment was canceled causing a delay in re-scheduling.  "[A] delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm."  Garrett, 254 F.3d at 950.  Skidgel summarily alleges he suffered injuries, but he provided no objective evidence showing of an injury due to having to wait for appointments in a crowded room or having an appointment canceled and re-scheduled.  Indeed, long waits in a doctor's crowded waiting room or physician-prompted rescheduling of appointments are facts of life and routinely faced, regardless of one's residence.

For all of the above-stated reasons, the Court finds no genuine issues of material fact concerning possible Eighth Amendment claims against Defendants based on the medical care that was provided.  Therefore, the Court recommends that all Eighth Amendment claims asserted against Defendants be dismissed, with prejudice.

### B.   *Alleged First Amendment Violation or Denial of Access to Court*

Skidgel's pleadings did not expressly allege a denial of, or a First Amendment violation of access to the courts.  However, because Skidgel proceeds *pro se*, the Court affords his filings a liberal construction, but properly declines to act as his advocate.  *See* Yang v. Archuleta, 525 F.3d 925, 927 n. 1 (10th Cir. 2008).

Here, Skidgel asserts a number of complaints against Defendants concerning the grievance process and whether prison officials complied with the grievance procedures by timely responding.

31

Skidgel also claims that "the senior warden refuses to address the conduct of the grievance officer of violations of the grievance procedure." [Doc. 9-1, at 9.]

In liberally construing these allegations, the Court determines that such allegations may attempt to raise a claim that Defendants allegedly interfered with Skidgel's right of access to the courts. The constitutional right of access to the courts is guaranteed by the Due Process Clauses of the Fifth and Fourteenth Amendments. Ward v. Kort, 762 F.2d 856, 858 (10th Cir. 1985). In addition, access to courts is a fundamental right protected by the Constitution, including the First Amendment right to petition the government for redress of grievances. Nordgren v. Milliken, 762 F.2d 851, 853 (10th Cir.), *cert. denied,* 474 U.S. 1032 (1985). Because a prisoner must first file a grievance in order to ultimately gain access to courts to state a claim for relief under 42 U.S.C. § 1997e, punishing the inmate for actually filing grievances could state a claim for a both an access to courts and a First Amendment violation. *See* Smith v. Maschner, 899 F.2d 940, 947 (10th Cir. 1990) (noting case law stating prison officials may not unreasonably hamper inmates in gaining access to the courts).

However, this is not a case where Skidgel contends that he was disciplined as a result of filing a grievance. *See, e.g.,* Smith, 899 F.2d at 947 ("existence of an improper motive for disciplining a prisoner which results in interference with a constitutional right" may give rise to a cause of action under § 1983). Skidgel supplied no evidence that he was disciplined for filing grievances.

Notwithstanding a lack of evidence of actual disciplinary action, Skidgel may contend that prison officials threatened him with discipline because of the numerous grievances he repeatedly filed that were considered frivolous and harassing. *See, e.g.,* Table 1, entry of 9/13/11 (grievance - event 10) (corrections officer denied formal grievance and admonished Skidgel for filing frivolous

32

grievances, noting the quantity of grievance Skidgel filed against medical services and other facilities; Skidgel was further advised that he could be subject to disciplinary action if he continued to abuse the grievance process).

The applicable grievance procedure expressly provides that inmates are prohibited from the misuse/abuse of the grievance system.  "Inmates are not to use this procedure as a form of harassment against staff.  Such grievances will be denied." [Doc. 32-3, Ex. M (CD-150501E), at 15.] "Inmates using the grievance procedures to perpetrate the commission of a purposeful misconduct will be subject to disciplinary action consistent with current disciplinary policy provisions." [Id.] While the Court need make no determination as to this matter, it observes, based on the quantity and content of Skidgel's grievances, that he may very well be misusing the grievance process.  While "prison officials may not affirmatively hinder a prisoner's efforts to construct a *nonfrivolous* appeal or claim," Green v. Johnson, 977 F.2d 1383, 1389 (10th Cir. 1992) (emphasis added), nothing in the Constitution authorizes an inmate to abuse and misuse the grievance system by filing repeated frivolous complaints.  There is no constitutional right to file frivolous pleadings.

Here, it is clear by the number of grievances filed and by the fact that Skidgel filed this civil rights lawsuit (Table 1, Grievances, Events 1-10) that he was neither denied access to the courts nor prejudiced.  Moreover, an inmate alleging denial of access to the courts must allege an actual injury. Lewis, 518 U.S. at 349 (1996); Cosco v. Uphoff, 195 F.3d 1221, 1224 (10th Cir. 1999), *cert. denied*, 531 U.S. 1081 (2001).  Even if Skidgel established a delay in processing one of his many grievances, he did not produce evidence showing Defendants interfered with his right to file nonfrivolous grievances or right of  access to the court.   Under the circumstances of this case, Skidgel is unable to show any injury that resulted from an alleged First Amendment violation or a claim of denial of access to the courts.

Because there are no genuine issues of material fact with respect to potential claims under the First Amendment or for denial of access to the courts, the Court recommends dismissal of such claims, with prejudice.

### C.     _Alleged Violations of State Law_

In addition to federal constitutional claims, Skidgel seeks to bring the same claims clothed in the garb of state common law or tort claims.  For example, he contends that Defendants committed medical malpractice and medical negligence.  He further asserts that Defendants did not meet the applicable standard of care, which he asserts is set out in Merck's Manual.  He alleges unspecified emotional distress damages and contends that Phillips is responsible for actions taken by CMS under the doctrine of respondeat superior.

Skidgel argues that Defendants, specifically CMS, refused to provide adequate medical staffing and that it violated its contract with the New Mexico Corrections Department.  Skidgel further contends that Defendants violated "state rights" to inmate health care "as well as health systems bureau and ACA standard as well as the [New Mexico] Corrections Department Policies," and "paragraph 1.1 of the vendor and contract." [Doc. 9-1, at 5-6.] He alleges that Defendants violated The GEO Group, Inc.'s Inmate Handbook for the NENMDF.

In analyzing his constitutional claims, the Court concluded that Skidgel was unable to demonstrate a material issue of fact in relation to claims that he was denied necessary and appropriate medical care or that cancellation of a single medical appointment violated his rights. In other words, the undersigned Magistrate Judge already concluded that Defendants properly assessed Skidgel's medical condition and took adequate steps to provide him with reasonable medical care and services.  Moreover, Defendants provided the affidavit of Dr. Todd Wilcox, who testified that he was board certified in urgent care medicine and had worked in detention and

correctional medical clinics for 17 years. [Doc. 34-5, Ex. V, Wilcox Aff., ¶ 4.]  After a review of Skidgel's medical records, Dr. Wilcox provided expert medical opinion that Defendant CMS's care and treatment of Skidgel met the applicable medical standard of care and the standards common to correctional facilities. [Id., ¶¶ 5-6.] Skidgel supplied no expert medical testimony to rebut Dr. Wilcox's medical opinions.  The Court concludes, therefore, that there are no genuine issues of material fact with respect to whether the medical care and treatment provided were below the minimum standard of care required by New Mexico's substantive law.

In addition, Skidgel refers to "notices of claims," he filed under the New Mexico Tort Claims Act ("NMTCA") on March 26, 2010, August 24, 2011, and September 19, 2011. [Doc. 9-1, at 4.] In the August 24, 2011 notice of claim, Skidgel asserted, *inter alia*, violations of disciplinary policies, withholding medical records even though Skidgel paid copying fees, and failures to meet "contract obligations . . . and state laws requiring provision of medical services to me." [Doc. 9-1, at 15-16.] In the September 19, 2011 notice of claim, Skidgel alleged that Phillips violated the New Mexico Medical Malpractice Act, the Rules of Evidence, and the New Mexico State Statutes, "attempting to circumvent state law . . . ." [Doc. 9-1, p. 17.]

Most of these claims are pled so generally that it is impossible to determine what specific violations Skidgel attempts to assert.  At most, the Court construes such claims as attempts to allege negligence on the part of Defendants.  However, Skidgel did not produce evidence of physical injury or damages related to alleged negligence.  *See* Spurlin v. Paul Brown Agency, Inc., 80 N.M. 306, 307 (1969) ("[T]here [is] no cause of action for negligence until there [has] been a resulting injury.").  *See also* Castillo v. City of Las Vegas, 145 N.M. 205, 2008–NMCA–141, ¶¶ 22, 32 (2008) (plaintiff can recover for emotional injuries caused by another's negligence, but may

35

generally only do so if the conduct also caused a personal, physical injury).  Here, there is no evidence of an injury other than conclusory allegations of distress or damages.  That is insufficient.

In addition, "incidents of negligence, while unfortunate, cannot be the basis of a constitutional claim of either deliberate indifference to [an inmate's] medical needs under the Eighth Amendment or of a deprivation of due process under the Fourteenth Amendment." Hood v. Prisoner Health Servs., Inc., 180 F. App'x 21, 26 (10th Cir. May 9, 2006) (unpublished) (internal citation omitted).  See Williams v. Meese, 926 F.2d 994, 998 (10th Cir. 1991) (inmate's claim that grievance procedures were inadequate was properly dismissed; allegations were too conclusory to state a claim for relief and asserted, at most, negligent conduct that did not implicate the due process clause); Buchanan v. Oklahoma, 398 F. App'x 339, 342 (10th Cir. Oct. 12, 2010) (unpublished) (insofar as prison officials acted with simple negligence, that would not be enough to raise due process concerns).

Based on the notices of claim filed under the NMTCA, Skidgel argues that Defendants violated Skidgel's rights by continuing to contact him for medical services after submitted several written requests to Defendants not to do so. [Doc. 9-1, at 11-13.] He also contends that Defendants' continued attempts to schedule medical appointments for him after he filed notice of pending litigation under the NMTCA constitute harassment and retaliation.

Skidgel asserts that there is tort liability because Defendants persisted in trying to provide medical services to him after he filed notice of proposed litigation.  The short answer is that Defendants' conduct does not constitute a tort.

Defendants, after all, are obligated to provide reasonable and necessary medical care to those in their custody.  See Estelle, 429 U.S. at 103 (Eighth Amendment creates an obligation on the part of prison officials to provide adequate health care to inmates); Riddle v. Mondragon, 83 F.3d 1197,

1203 (10th Cir. 1996) (inmates are entitled to "a level of medical care which is reasonably designed to meet the routine and emergency health care of inmates.") (internal citation omitted).  Thus, ascertaining Skidgel's medical status and proposing care and treatment, when necessary, is consistent with Defendants' custodial obligations.  *See, e.g.,* Pabon v. Wright, 459 F.3d 241, 246 (2d Cir. 2006) (observing that prison officials may administer treatment to an inmate despite that inmate's desire to refuse treatment if, in the exercise of their professional judgment, the officials reasonably determine that providing such treatment furthers a legitimate penological interest).

Should Skidgel attempt to allege that Defendants continued attempts to provide medical treatment for him are a violation of his liberty interests to refuse treatment, such a claim also fails. While "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment,"[17] Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 278 (1990), prison officials must balance that right against the need to provide adequate medical care to those in their custody.  Moreover, scheduling medical appointments for adequate care and treatment of an inmate is not the type of invasive course of treatment that might infringe on an prisoner's right to refuse medical care.  *See* Runnels v. Rosendale, 499 F.2d 733, 735 (9th Cir. 1974)  (noting that "unwanted major surgical procedures upon the body of an inmate" may violate due process rights that are rooted in traditional protections against physical assault and violation of bodily privacy by the state).  Indeed, to follow Skidgel's instructions to provide no medical care or no medical appointments, would subject prison officials to a deliberate-indifference claim.  The Court concludes

---

[17]It is true, of course, that Skidgel has a right to refuse treatment and medication.  An inmate may not be forcibly medicated except under extraordinary circumstances not applicable here.  For example, Skidgel has not been declared incompetent to make treatment decisions; he is not a minor with a parent or someone *in loco parentis* consenting to treatment, and no court order has been entered authorizing involuntary treatment.

that Skidgel did not establish any material issue of fact in dispute supporting his position that Defendants' ongoing treatment attempts are an actionable tort or a constitutional violation.

Skidgel's reply to Defendants' response might be interpreted to mean that he believes all the above-described state law claims are properly brought under 42 U.S.C. § 1983. [Doc. 41, at 9, ¶ 98; Doc. 46, at 6.] Defendants argue that any rights Skidgel might have under various standards, policies, and procedures are not constitutionally protected rights. [Doc. 46, at 7.]

The Court agrees.  "Section 1983 creates only the right of action; it does not create any substantive rights.  Substantive rights must come from the Constitution or federal statute." Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1239 (D.N.M. 2010).  Here, the Court already analyzed all of the federal constitutional claims Skidgel raised and recommends that they be denied and dismissed, with prejudice.  The state law claims based on alleged violations of policies, procedures, and standards are not substantive rights that arise under the federal constitution or federal statute. Instead, these claims are part and parcel of Skidgel's constitutional allegations.  As the Court concluded that the constitutional claims should be dismissed, so, too, should the state law claims be dismissed.

## **Recommended Disposition**

The Court recommends that summary judgment on the federal and state law claims be granted with respect to all Defendants.  Accordingly, the Court recommends that Skidgel's complaint, including all federal and state law claims be denied and dismissed, with prejudice, as discussed above.  Skidgel is advised that, while he is permitted to file objections (*see* n. 1), he should present his objections in a single pleading.  In other words, he is not authorized, without express written permission from the Court, to file multiple sets of objections, multiple pleadings containing objections, or objections plus supplemental objections.  Should Skidgel need to file more than one

pleading containing objections, he must file a motion to request and obtain permission from the

Court to do so.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge